# In the United States Court of Federal Claims

No. 11-597C

(Filed: January 15, 2013)

_____

| | |
|---|---|
| ESTES EXPRESS LINES,<br><br>      Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>      Defendant. | *<br>*  Contract case; Motion to dismiss under RCFC<br>*  12(b)(1) and 12(b)(6); Standard of review;<br>*  Subcontractor lacked privity of contract with<br>*  the United States; Contractor was not agent of<br>*  Federal agency; 49 U.S.C. § 13706; Case<br>*  dismissed for lack of jurisdiction.<br>*<br>*<br>*<br>* |

_____

**OPINION**

_____

*Robert D. Moseley, Jr.*, Smith Moore Leatherwood LLP, Greenville, SC, for plaintiff.

*Daniel B. Volk*, Civil Division, United States Depart of Justice, with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

This contract case is before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) or, alternatively, RCFC 12(b)(6). The plaintiff, Estes Express Lines, Inc. (Estes Express or plaintiff), an interstate motor carrier, claims that an arm of the United States Department of Defense breached contracts for transportation services by failing to pay it $147,645.33 in charges. Having carefully considered the parties' claims, the court hereby **GRANTS** defendant's motion under RCFC 12(b)(1), finding that there was no privity of contract between plaintiff and the United States upon which to predicate jurisdiction here.

**I.  BACKGROUND**[1]

The facts required here are simple and few.

Estes Express is a duly-licensed federal motor carrier, based in Richmond, Virginia.  The Marine Corps Exchange (MCX) is a division of the United States Marine Corps Community Services (MCCS).

On October 31, 2007, MCCS awarded contract number H0107-D-0005 to Salem Logistics, Inc. (Salem) to coordinate its logistics and communicate with motor carriers to carry the products and goods of various shippers to MCX locations throughout the United States.  Salem was contracted to provide freight management services with respect to, and in support of, MCCS's and MCX's in-bound shipments (*i.e.*, to ensure that they were picked up at a seller's location and delivered to an MCX location).  The contract required Salem to "make payment to the commercial transportation carriers for services rendered to move products covered by [the contract], in accordance with terms and conditions negotiated between the two parties."  Salem was then to "invoice the MCCS/MCX destinations for actual transportation expenses and the management fees . . . for the shipped merchandise that was successfully delivered to the correct MCCS/MCX destination."[2]  The contract between MCCS and Salem also indicated that Salem "shall not represent itself to be an agent or representative of MR, MCCS or any other agency or instrumentality of the United States."  The contract went on to state that "[a]ny subcontractor used in connection with this contract is the agent of [Salem] and not the agent of MR and MCCS."

Between June 2008 and February 2009, Salem arranged for Estes Express to carry various shipments for MCX.  Though a written contract did not govern the relationship between Estes Express and Salem, the shipments moved pursuant to the former's "common carrier tariff," and each shipment was identified by:  (i) a bill of lading;[3] (ii) a freight bill; and (iii) a delivery receipt.

---

[1]  These facts are drawn largely from plaintiff's complaint, and, for purposes of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Additional details are drawn from documents filed by the parties that are referenced in plaintiff's complaint and integral to the claims made therein.  *See Normandy Apartments, Ltd. v. United States*, 100 Fed. Cl. 247, 255 n.10 (2011).

[2]  The contract indicated that Salem could request "reimbursement for transportation carrier charges incurred moving MCCS/MCX shipments as frequently as weekly."

[3]  Commercial bills of lading such as the ones at issue here are also referred to as "straight bills of lading" in order to distinguish them from "government bills of lading." Government bills of lading are contracts between the government and carrier and establish

Under the bills of lading, various MCX locations were listed as "consignee," while various third parties (the sellers) were listed as shipper. In some cases, goods were moved from a Navy Exchange (NEX) location to an MCX location, rather than from a third-party service provider to MCX. In the latter cases, government entities were listed as both consignee and shipper. The contract between Salem and MCCS specified that the charges were to be billed, pursuant to the shipping documents, to "Marine Corps Exchange C/O Salem Logistics" – and the bills of lading reflected this.

Plaintiff filed, as exhibits to its opposition to defendant's motion to dismiss, certain exemplar shipping documents. For example, a "Bill of Lading" dated October 30, 2008, contains the following information. The "Ship From" box indicates that the shipper is "MJ SOFFE COMPANY" and lists that company's address. The "Ship To" box indicates that the destination for the shipment is "MCCS 05100 – NEW MAIN STORE" and lists the address for that location. In a box labeled "Third Party Freight Charges Bill To," the bill of lading indicates "MARINE CORPS EXCHANGE C/O SALEM LOGISTICS" and provides Salem's address. The form contains other information about the items being shipped. At the bottom, the bill of lading is signed by the "Shipper" and by the "Carrier." On this particular bill of lading, the individual that signed for the "Carrier" indicated that he was a representative of Estes Express. It is unclear on the face of the document which entity the individual who signed for "Shipper" represented.

With respect to the same shipment, plaintiff also included an "Original Freight Bill" and a "Delivery Receipt," both of which indicate that they are "Estes Express Lines" documents because they have the Estes Express logo in the upper-left corners. These documents, like the bill of lading, are dated October 30, 2008. The freight bill indicates that "MCCS 05100 – NEW MAIN STORE" is the "Consignee" and that "M J SOFFE COMPANY" is the "Shipper." The freight bill also indicates: "Bill Charges To . . . MARINE CORPS EXCHANGE % SALEM LOGISTICS" and lists Salem's address. Finally, the freight bill contains a listing of the charges associated with the shipment. The delivery receipt lists the same "Consignee" and "Shipper" as the freight bill and contains information about the items being shipped. Unlike the freight bill, the delivery receipt indicates: "Bill Charges To . . . MARINE CORPS EXCHANGE" and contains Salem's city, state, and zip code, but not its street address or, indeed, mention of Salem at all. The delivery receipt is signed by a representative of the MCX location to which the goods were delivered (and by some other unidentified individual).

Each shipment arranged by Salem to be shipped by Estes Express was accepted by the consignee – MCX – without exception, and no claims arising out of the carriage of the specified loads were made against Estes Express. Following the shipments, Estes Express invoiced "MCX, care of Salem" for payment of freight charges. However, Estes Express has not been paid on certain invoices by Salem, MCCS, MCX, NEX, or any other entity.

---

privity of contract. *See, e.g.*, *Cent. Transp. Int'l, Inc. v. United States*, 63 Fed. Cl. 336, 338 (2004).

Estes Express invoiced Salem for freight charges with regard to shipments for MCX in the total principal amount of $66,283.68. When combined with a loss discount of $110,292.93 per the terms and conditions of Estes Express' "common carrier tariff," the total amount due to Estes Express was $176,576.61.[4] MCX subsequently paid Estes Express $28,931.28, representing monies owed for which MCX had not yet paid Salem,[5] leaving a total amount due of $147,645.33.[6] MCX refuses to pay Estes Express any amount owed for which MCX claims it paid Salem.

On February 3, 2010, Estes Express filed suit against Salem and other defendants, including government entities, in the United States District Court for the Middle District of North Carolina. Complaint, *Estes Express Lines v. Salem Logistics, Inc.*, No. 10-102 (M.D.N.C. Feb. 3, 2010). On July 8, 2011, the District Court entered an order transferring the case to this court. Order, *Estes Express Lines v. Salem Logistics, Inc.*, No. 10-102 (M.D.N.C. July 8, 2011). Plaintiff filed its transfer complaint in this case on October 17, 2011. On January 6, 2012, defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) and (6), and, on March 26, 2012, briefing was complete on that motion. On September 27, 2012, the court held a telephonic oral argument on defendant's motion.

## II. DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Twombly*, 550 U.S. at 555. The plaintiff must establish that the court has subject matter jurisdiction over its claims. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Normandy Apartments*, 100 Fed. Cl. at 251. The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991). RCFC 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." But, this provision "does not apply to a motion made

---

[4] Under "loss-of-discount" tariff rules, certain allowances and discounts are lost if the tariff charges are not paid within a certain number of days after the shipment. The loss of these discounts has the effect of increasing the amount owed for shipment.

[5] In February 2009, MCCS terminated its contract with Salem after it became aware that Salem was not remitting payment to its carriers. At that time, MCX paid Estes Express directly for invoices for which it had not already paid Salem.

[6] Of the total amount plaintiff claims is due, NEX was the shipper on shipments for which the total principal amount of the freight charges was $12,242.02. When combined with a loss discount of $36,147.83, the total amount owed with respect to these shipments is $48,389.85.

under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002)); *see also Petro–Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 58 (2009).

Defendant argues, under RCFC 12(b)(1), that this court lacks jurisdiction over plaintiff's complaint because the contract on which plaintiff predicates its case was not with the United States or an agency thereof. Defendant further contends that this lack of privity is controlling despite plaintiff's invocation of 49 U.S.C. § 13706, which deals with the liability of consignees for shipping charges incurred by a common carrier. Plaintiff demurs to these dismissal arguments, making various contentions to which the court will now turn.

"[F]or the government to be sued on a contract pursuant to the Tucker Act, there must be privity of contract between the plaintiff and the United States." *Chancellor Manor v. United States*, 331 F.3d 891, 899 (Fed. Cir. 2003); *see also Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003). "This is so because the doctrine of sovereign immunity precludes a suit against the United States without its consent and because, under the Tucker Act, the United States has '"consent[ed] to be sued only by those with whom it has privity of contract."'" *Normandy Apartments*, 100 Fed. Cl. at 254 (quoting *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) (quoting *Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984))); *see also First Annapolis Bancorp., Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011), *cert. denied*, 132 S. Ct. 2102 (2012). Accordingly, "[t]he effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998), *cert. denied, sub nom., Sherman Park Apartments v. United States*, 528 U.S. 820 (1999). Conversely, a finding lack of privity deprives this court of jurisdiction. *See First Annapolis Bancorp*, 644 F.3d at 1373 ("The lack of privity impacts the lack of waiver of sovereign immunity, which is available pursuant to the Tucker Act."); *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005), *cert. denied, sub nom., Martin v. United States*, 548 U.S. 904 (2006) ("[S]tanding and privity of contract with the government are questions of subject matter jurisdiction."); *see also Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Absent privity between [plaintiff] and the government, there is no case.").

Contrary to plaintiff's claims, there was no direct privity of contract between it and the United States. It was Salem, and not Estes Express, that had a contractual relationship with defendant; Estes Express' contractual relationship was with Salem only, as a subcontractor. This relationship is plainly reflected in the contract that defendant had with Salem, which described the nature of its services and the invoicing mechanisms that would be employed in reimbursing Salem for the amounts that it paid to its carriers, such as Estes Express. Those provisions, and others, made clear that Salem, and not defendant, would be directly liable to the carriers for the transportation charges incurred. *Compare United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1551 (Fed. Cir. 1983) (indicating that a subcontractor attempting to demonstrate privity with the government must show, *inter alia*, that "the contract stated that the government would be directly liable to the vendors for the purchase price"); *see also Nat'l Leased Hous. Ass'n v.*

*United States*, 105 F.3d 1423, 1435-36 (Fed. Cir. 1997); *US W. Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 629 (Fed. Cir. 1991). Nothing in the bills of lading that plaintiff has introduced into the record contradicts this notion. Rather, the descriptions and signatories on those bills are consistent with the notion that Salem, and not MCX or MCCS, had a carrier contract with Estes Express. As such, there is little to distinguish this case from several others in which this court has dismissed the contract claims of freight subcontractors because of a lack of privity. *See Cent. Freight Lines, Inc. v. United States*, 87 Fed. Cl. 104, 107, 109 (2009) ("While the plaintiff[-subcontractor] has supplied this court with over 1,300 [straight bills of lading] between itself and [the government contractor], the [straight bills of lading] fail to establish a contractual relationship between the government and [plaintiff]."); *Cent. Transp.*, 63 Fed. Cl. at 338-39 (holding that the straight bills of lading at issue did "not establish contractual privity with the Government, since the Government was not a party to those bills of lading").[7]

Undaunted, Estes Express contends that privity existed between it and the United States for two other reasons. First, plaintiff asserts that the United States was a party to the contract that Salem signed with it because Salem signed that contract as the government's agent. To be sure, the Federal Circuit has recognized that privity may be established under such an agency or "deemed privity" theory. *See, e.g.*, *Johnson Controls*, 713 F.2d at 1551; *see also RMI Titanium Co. v. Westinghouse Electric Corp.*, 78 F.3d 1125, 1139 (6th Cir. 1996). But, the contract between Salem and MCX thoroughly rebuffs the notion that such an agency relationship existed here, as it flatly indicated that Salem "shall not represent itself to be an agent or representative of MR, MCCS or any other agency or instrumentality of the United States." That contract went on to emphasize that "[a]ny subcontractor used in connection with this contract is the agent of [Salem] and not the agent of MR and MCCS." In *Johnson Controls*, similar clauses were viewed as "an important, if not determinative, factor" indicating that a contractual relationship between a subcontractor and the United States did not exist. *Johnson Controls,* 713 F.2d at 1553; *see also RMI Titanium*, 78 F.3d at 1139-40. In sum, even drawing all reasonable inferences in favor of the plaintiff, Estes Express has failed to demonstrate that its agency argument amounts to anything. *See Twombly*, 550 U.S. at 555; *see also YRC*, 104 Fed. Cl. at 367-68; *Cent. Freight Lines*, 87 Fed. Cl. at 109.

Finally, at least in its complaint (and at oral argument), Estes Express attempts to engraft its claim onto 49 U.S.C. § 13706 – asserting either that the statute establishes the requisite privity here or independently establishes a basis for recovery here. Neither is the case. Section 13706 "governs the liability of consignees for shipping charges incurred by a common carrier." *Cent.*

---

[7] *See also YRC, Inc. v. United States*, 104 Fed. Cl. 360, 367 (2010) (interpreting similar MCCS bills of lading as not evidencing a "mutual intent to contract"); *Fikse & Co. v. United States*, 23 Cl. Ct. 200, 203 (1991) ("[T]he bill of lading merely defines the terms under which the goods are shipped. The fact that the consignee must take notice of rate and payment terms for the delivery does not mean that a contractual obligation springs up in the consignee to pay shipping charges in the absence of an agreement by it to do so.").

*Freight Lines*, 87 Fed. Cl. at 111.[8]  That statute, however, does not "create liability in the consignee in the face of an express contractual allocation elsewhere of freight charges." *Fikse*, 23 Cl. Ct. at 204; *see also In re Roll Form Prods., Inc.*, 662 F.2d 150, 154 (2d Cir. 1981) ("The [Interstate Commerce] Act . . . was not intended to 'fashion a sword' to insure collection by carriers of freight charges [nor] . . . to impose an absolute liability upon consignees for freight charges.").  As such, this court has twice rejected the notion that this statute either independently provides this court with jurisdiction, or does so in conjunction with the Tucker Act.  *Cent. Freight Lines,* 87 Fed. Cl. at 112; *Cent. Transp.*, 63 Fed. Cl. at 340 & n.10.  And the court sees no reason – certainly nothing off-handedly supplied by plaintiff – to depart from the holdings in these well-reasoned cases.

---

[8]  Section 13706 of Title 49 provides:

(a)  Liability of consignee.—Liability for payment of rates for transportation for a shipment of property by a shipper or consignor to a consignee other than the shipper or consignor, is determined under this section when the transportation is provided by motor carrier under this part.  When the shipper or consignor instructs the carrier transporting the property to deliver it to a consignee that is an agent only, not having beneficial title to the property, the consignee is liable for rates billed at the time of delivery for which the consignee is otherwise liable, but not for additional rates that may be found to be due after delivery if the consignee gives written notice to the delivering carrier before delivery of the property –

(1) of the agency and absence of beneficial title; and

(2) of the name and address of the beneficial owner of the property if it is reconsigned or diverted to a place other than the place specified in the original bill of lading.

(b)  Liability of beneficial owner.—When the consignee is liable only for rates billed at the time of delivery under subsection (a), the shipper or consignor, or, if the property is reconsigned or diverted, the beneficial owner is liable for those additional rates regardless of the bill of the lading or contract under which the property was transported.  The beneficial owner is liable for all rates when the property is reconsigned or diverted by an agent but is refused or abandoned at its ultimate destination if the agent gave the carrier in the reconsignment or diversion order a notice of agency and the name and address of the beneficial owner.  A consignee giving the carrier erroneous information about the identity of the beneficial owner of the property is liable for the additional rates.

49 U.S.C. § 13706.

### III.     CONCLUSION

The court will not gild the lily.  Based on the foregoing, the court hereby **GRANTS** defendant's motion to dismiss this case under RCFC 12(b)(1) for lack of jurisdiction.  The Clerk is hereby ordered to dismiss the complaint.

**IT IS SO ORDERED.**

s/Francis M. Allegra
Francis M. Allegra
Judge
